United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Setai Hotel Acquisition, LLC, Plaintiff | ) ) |
| v. | ) Civil Action No. 16-21296-Civ-Scola |
| Miami Beach Luxury Rentals, Inc. and Allen Tuller, Defendants. | ) ) ) |

## Order on Motions for Summary Judgment

This matter is before the Court on the Plaintiff Setai Hotel Acquisition's ("SHA") motion for partial summary judgment (ECF No. 164). The Defendants Miami Beach Luxury Rentals, Inc. ("MBLR"), and Allen Tuller responded (ECF No. 169), and SHA replied (ECF No. 181). Also before the Court is the Defendants' motion for summary judgment (ECF No. 158). SHA responded (ECF No. 166), and the Defendants replied (ECF No. 183). Finally, SHA requests that the Court take judicial notice of certain evidence in support of its motion for summary judgment (ECF No. 142).

The Court has reviewed the record, the parties' briefs, and the relevant legal authorities. For the reasons more fully explained below, the Court **grants in part and denies in part** SHA's motion for judicial notice (**ECF No. 142**), **denies** the Plaintiff's Motions for Summary Judgment (**ECF No. 164**), and **denies** the Defendants' Motion for Summary Judgment (**ECF No. 158**).

## 1. Background

SHA brought this action against the Defendants, raising six statutory and common-law trademark claims: counterfeiting pursuant to 15 U.S.C. § 1116 (Count 1); infringement pursuant to 15 U.S.C. § 1114 and common law (Counts 2 and 4, respectively); unfair competition pursuant to the Lanham Act, 15 U.S.C. § 1125, and common law (Counts 3 and 5, respectively); and dilution (Count 6). (Am. Compl., ECF No. 110.) SHA also alleges a state-law claim of tortious interference in Count 7. (*Id.*) The Defendants raised thirty-one affirmative defenses[1] and brought three counterclaims: (1) false advertisement

---

[1] As succinctly as possible, the Defendants raised the following affirmative defenses, some of which are clearly duplicative: (1) fair use; (2) failure to police the mark; (3) abandoned mark; (4) fraud in the registration of a trademark; (5) use of mark to misrepresent source of good or services; (6) improper expansion of mark; (7) fair use; (8) fair use; (9) violation of antitrust laws; (10) misuse of mark; (11) laches; (12) bad faith; (13) failure to police mark; (14) unclean hands; (15) failure to police mark; (16) acquiescence; (17) estoppel; (18) preclusion based on the Condominium Declaration; (19) misrepresentation; (20) fair use; (21) functional mark. (22)

under the Lanham Act; (2) unfair competition; and (3) violation of Florida's Deceptive and Unfair Trade Practices Act. (Answer and Countercls. at 35–41, ECF No. 138.) SHA answered the counterclaims and raised four affirmative defenses. (Answer, ECF No. 177.)

The United States Patent and Trademark Office ("USPTO") issued a trademark registration Number 2,506,974 for "The Setai" on November 13, 2001 ("the Setai Mark" or the '974 Mark). (USPTO File at 1,[2] ECF No. 142-1.) The Setai Mark includes real estate management, real estate development and construction, and hotel and resort services. (*Id.*) The previous owners of the mark renewed it on June 5, 2007, and May 21, 2012. (*Id.* at 1–2.) In fact, the previous owners filed, and the USPTO accepted and acknowledged, and affidavit of incontestability. (*Id.* at 3, 37, 41.)

On February 27, 2015, Lehman Brothers Holding, Inc., assigned and transferred "all right, title[,] and interest in and to the [Setai] Mark[]" to BPI Lux S.à.r.l. ("BPI") and the Alexandre von Furstenberg Living Trust ("Trust"). (Lehman Assignment, Mot. Extension of Time Ex. 1 at 3, ECF No. 96-1.) Under the Lehman Assignment, BPI owns 85% of the '974 Mark, and the Trust owns 15% of the '974 Mark. (*Id.*) The Lehman Assignment provided that the "Assignors and Assignees have caused this Assignment to be executed by their duly authorized representatives as of the date first written above." (*Id.* at 4.) All of the relevant representatives signed the Lehman Assignment on April 1, 2015. (*Id.* at 4–5.)

Also on February 27, 2015, BPI and the Trust assigned to SHA "the exclusive right and license to use the ['974 Mark] . . . throughout the [United States]." (SHA License §§ 1.1 & 3.1, Aff. of Mounayyer Ex. 1 at 2–3, ECF No. 143-2.) The SHA License provides that SHA "shall not . . . permit others to use the . . . 'SETAI' formative trademark, . . . [or] domain name . . . in any way inconsistent with [BPI and the Trust's] rights therein and all uses of the ['974 Mark] shall inure to the benefit of [BPI and the Trust]." (*Id.* § 4.1(a) at 3.) The SHA License further provides, "[BPI and the Trust] shall have the exclusive right to take action or institute proceedings with respect to such infringement, and shall proceed as it may, in its sole discretion. If [BPI and the Trust] elect not to take action or fail[] to diligently prosecute such action, [SHA] may take such action at [SHA's] expense." (*Id.* § 4.2 at 3–4.)

---

merely descriptive mark; (23) indistinctive mark; (24) non-competition; (25) preclusion based on date of assignment; (26) preclusion based on statute of limitations; (27) failure to mitigate; (28) waiver of tortious interference claim; (29) privilege; (30) lack of rights created by Declaration; and (31) failure to show that the Defendants provided hotel services. (Answer and Countercls. at 27–34, ECF No. 138.)

[2] The Court takes judicial notice of the USPTO file history of the Setai Mark. *See infra.*

Since February 27, 2015, SHA holds a Special Warranty Deed delineating their ownership in a real property known as The Setai Resort & Residences, a Condominium ("the Condominium").[3] It appears that SHA owns seventy-nine "Condominium Parcels," a retail/commercial unit, a hotel unit, and a utility unit. (Deed at 4, ECF No. 142-3.) The "Hotel Unit" is not the same physical space as the "Hotel Building." (Declaration at 32, ECF No. 142-2.) Though not clearly stated, it appears that the "Condominium Parcels" are actually located in the Hotel Building, and not in the condominium Tower Building. (Depo. Alex Furrer at 35–36, 38, ECF No. 140) ("[SHA] doesn't own any condominium apartments. . . . [SHA] owns about 70 hotel rooms in the Act Deco Building."). However, SHA "operat[es] multiple private condos as hotel suites . . . . Legally speaking [guests] are staying in a private unit . . . . But they are staying in a private unit which is completely . . . 100 percent managed by [SHA] . . . . under a multiple-year contract for full hotel management." (*Id.* at 35, 38, 39.) SHA does not officially share this information with the public, and the private units are considered collectively part of "the Setai Hotel." (*Id.* at 39; Aff. Mounayyer ¶ 6, ECF No. 143-1.)

The Condominium, which SHA continues to refer to as "The Setai®," is governed by the Declaration of Setai Resort and Residences, a Condominium ("the Declaration"), a publicly recorded document. (Mot. Ex. B, ECF No. 142-2.) Pursuant to the Declaration, SHA's "Hotel Unit" consists "of all of the [property], . . . less and except only the following: (i) the Residential Units, the Utility Unit and the Retail/Commercial Unit and (ii) the portion of the Condominium Property below minus seventy feet . . . ." (*Id.* ¶ 3.2(b).) SHA appears to interpret this provision to mean that it owns the entire "Tower Building," which contains the privately owned condominium units. The Condominium's "Common Elements" form part of the "Hotel Unit," and thus fall under SHA's ownership. (*Id.* ¶ 2.16.) The Declaration also provides, "The Owner from time to time of the Hotel Unit shall have the exclusive right (but not the obligation) to provide hotel and/or transient rental services, including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage services to the Condominium and the Unit Owners." (*Id.* ¶ 16.3.)

Signage on the real property does not distinguish the entryway to the "Setai Hotel" versus the entryway to the Condominium. (Depo. Alex Furrer at 41.) In fact, Furrer notes that "Setai" refers to the "entire hotel and residences," and that private owners say 'I live at the Setai.'" (*Id.* at 52.) Tuller also notes

---

[3] The Declaration itself refers to "the Setai Resort and Residences, a Condominium," as "the Condominium." (Decl. ¶ 1.3, Mot. Ex. B at 1, ECF No. 142-2.)

that as an owner of a unit in the Condominium and a previous resident of the Condominium, he knows that the Condominium Tower is referred to as "The Setai." (Decl. Allen Tuller ¶ 7), ECF No. 168.) Owners of individual condominium units, as well as their "guests," possibly have access to "hotel" amenities. (*Id.* ¶ 12(c).)

After SHA acquired the real property and the license, it began making changes to the way in which the owners of individual condominium units could conduct short-term rentals. One such change was a requirement that each owner or third-party rental agency "register each tenant with the attached form at the front desk of the Tower Building." (Decl. Allen Tuller # 2 Ex. 2 at 20, ECF No. 168.) The required transient rental unit registration form included the double-palm logo and "The Setai" at the top of the page. (*Id.* Ex. 3. at 25.) The hotel will no longer provide keys to guests of individually owned condo units, instead requiring that the owner or third-party agency provide the keys to short-term tenants. (Decl. Allen Tuller # 1 ¶ 21, ECF No. 154.) Also, at one point, SHA refused access to certain privileges, such as "signing privileges" to guests who had rented from third-party agencies. (Answer and Countercls. Exs. 10 & 11, ECF Nos. 138-10, 138-11.)

MBLR and Tuller, MBLR's sole officer, director employee, and shareholder, manage luxury private residential condominium suites, including units at the Condominium. (Depo. Allen Tuller at 5, ECF No. 147-1.) To this end, the Defendants operate a website at www.miamibeachluxuryrentals.com.[4] (Depo. Allen Tuller at 6, 32.) On this website, the Defendants advertised "'5-star private accommodations at the Setai Resort and Spa . . . for up to 70%* off the published hotel rates." (Pl.'s SMF ¶ 29, ECF No. 152-1; Defs.' SMF ¶ 29, ECF No. 170.) The website also included the following information:

1. "Bearing the unmistakable imprint of legendary hotelier Adrian Zecha, The Setai is an intimate oceanfront resort in the heart of South Beach;"

2. "The Setai Miami was recently chosen as the '#1 hotel in Miami Beach' by U.S. World & News Report and The Spa being voted the 'Best for Romance by SpaFinder Readers' Choice Awards' were just a few among the other recent awards. Conde Nast Traveler recently acknowledged The Setai on 'The Gold List 2012' in both US and UK, 'Readers' Choice Awards Best in the World,' as well as the 'Top

---

[4] The Court declines to take judicial notice of the historical versions of MBLR's website. However, to the extent that the Defendants do not dispute certain factual references to the information previously found on the Defendants' website, the Court will consider those facts. *See infra.*

50 Hotel Spas in the US.' Travel & Leisure The World's Best List #9 Large City Hotel in US/Canada", along with the Conde Nast Johansens Awards for the 'Most Excellent Hotel in the USA & Canada;'"

3. advertising "Holiday Events at The Setai" and stating "[t]o celebrate, we will present a series of special activities and events this Christmas . . .;"

4. stating "Miami Beach Luxury Rentals provides luxurious suites and villas from luxury hotels Miami in The Setai Miami Beach and the Setai South Beach, all available for your pleasure and enjoyment;"

5. stating "[w]e look forward to helping you find the best luxury rentals in Miami Beach from South Beach Miami hotels. For immediate assistance in booking your stay with Miami Beach Luxury Rentals today, please complete the online booking inquiry form below;"

6. stating "[t]he restaurant at the Setai is one of the many luxurious amenities that you will enjoy during your stay . . . . You are sure to enjoy your stay at the Setai Miami with a visit to the Setai restaurant to explore one of Chef Mathias exquisite creations;"

7. stating "[y]our stay at the Setai Miami is full of amenities such as the Pool & Beach Bar . . . . If you're relaxing by one of the three pools, or on our beach, service includes a select menu of snacks and light meals, as well as full beverage service;" and

8. quoting an alleged client as stating "[s]taying at the Setai resort was an experience that met all of my expectations, from the friendly staff, to the beach and nightlife just next door, I will definitely be back for another great stay."

(Pl.'s SMF ¶ 30; Defs.' SMF ¶ 30; Decl. Allen Tuller ¶ 9, ECF No. 168.)

The website continued to make the following representations:

1. "Starting with a perfect oceanfront setting in the heart of South Beach, The Setai Group and hotelier Adrian Zecha have created a private, luxurious world that is more than a condominium, hotel, and resort . . . it is a way of life.;"

2. "The Setai is a new, 40-story oceanfront glass tower as well as an 8-story art deco landmark building. Setai is also a member of the distinguished "Leading Hotels of the World.;"

3. "Set amid tropical gardens and sparkling pools at the edge of the Atlantic Ocean, Setai introduces the Asian traditions of simplicity and elegance to South Beach. A lavish spa, health club, and an

extraordinary restaurant and bar add to this 5-Star experience. Setai as the '#1 hotel in Miami Beach' by U.S. World & News Report and The Spa being voted the 'Best for Romance by SpaFinder Readers' Choice Awards' were just a few among the other awards received throughout the year of 2012.;"

4. "Conde Nast Traveler acknowledged The Setai on 'The Gold List 2012' in both US and UK, 'Readers' Choice Awards Best in the World,' [sic] as well as the 'Top 50 Hotel Spas in the US' [sic]. Travel & Leisure The World's Best List #9 Large City Hotel in US/Canada',[sic] along with the Conde Nast Johansens Awards for the 'Most Excellent Hotel in the USA & Canada.;'"

5. "For more information please visit www.setai.com."

6. "At the Setai, everything is available and all things are possible. The Setai staff is there to serve you, with passion, intelligence, and respect. At the Setai, you will be treated as if you are the most important person in the world;" and

7. "[The Hotel Spa is a] haven of serenity and natural beauty, The Spa at The Setai opens the door to an intimate private world dedicated to the restoration of the body, mind and soul. The philosophy behind this very special spa is derived from an ancient Sanskrit legend of the gods, who embarked on a quest for a natural elixir of immortality and eternal youth. Today, the unique and exotic treatments of The Spa at Setai reflect this legend, bringing the healing spirit and traditions of the east to South Beach."

(Pl.'s SMF ¶ 31, 33; Defs.' SMF ¶ 31, 33; Decl. Allen Tuller #2 ¶¶ 9, 11, ECF No. 168.)

While Tuller ultimately concedes that the information excerpted above appeared on previous versions of the Defendants' website, Tuller also notes that all the content on the website received approval from the previous owner of the Setai Hotel in approximately 2011. (Decl. Allen Tuller # 1 ¶ 7, ECF No. 154; Decl. Allen Tuller # 2 ¶¶ 9, 18, ECF No. 168.) In fact, in an email sent April 27, 2011, legal counsel to the previous owner of the Setai Hotel appears to approve of MBLR's webste, and requests that certain language found in the "About Us" section be moved to the Home Page.[5] (Decl. Allen Tuller # 1 Ex. 1 at 10.)

The Defendants also purchased Google AdWords containing the term "Setai." (Pl.'s SMF ¶ 28(b); Defs.' SMF ¶ 28.) Finally, the Defendants stipulated to owning the domain name www.setai.net and to redirecting internet traffic from that page to MBLR's website. (Resp. to Mot. to Compel at 2, ECF No. 224.)

---

[5] The Court notes that some of the text in the correspondence is missing.

In addition to MBLR's website, the Defendants used the Setai Mark in their correspondence with customers and potential customers:

1. Offered "suite that boa[s]ts the Setai Hotel Finishings and Furnishings package." (Sealed Depo. Allen Tuller Ex. 8 at 16, ECF No. 149-2);

2. Instructed customer to "check in as any guest" and that "[h]ousekeeping is available for an additional fee directly from the hotel." (*Id.* Ex. 11 at 26, 28);

3. Referred to the "5 star Setai" (*Id.* Ex. 18 at 119);

4. Referred to the "oceanfront 5 star leading Hotels of the world property" (*Id.* Ex. 19 at 121);

5. Told a client that "you can't get an oceanfront suite in Miami Beach at a 4 or 5 star hotel at that price level" (*Id.* Ex. 20 at 122);

6. Referred to The Setai as "the hotel" and stated that it is "the best hotel in all of south Florida" (*Id.* Ex. 21 at 125);

7. Told a client, "I'll try and get you in to Setai . . . standard rooms can only be book[ed] directly from the hotel . . . I only offer suites in the hotel tower . . . ." (*Id.* Ex. 22 at 127);

8. Told a client about "the Setai five star Hotel in the tower" (*Id.* Ex. 23 at 129);

9. Told a client that "[t]he hotel has made arrangements with []the Raleigh hotel close by where all Setai guests will have access to their pools complimentary" (*Id.* Ex. 24 at 131);

10. Referred to "the Hotel TOWER" to distinguish from the "art deco building" (*Id.* Ex. 26 at 142);

11. Referred to The Setai as "a high quality hotel" (*Id.* Ex. 27 at 147);

12. In response to an accusation that the Defendants were "not the hotel," wrote "Not the hotel? You have The Setai concierge services, room services, pool and beach services and gym/spa privileges amenities available to you" (*Id.* Ex. 28 at 148, 150); and

13. Called The Setai "the most expensive hotel in South Florida" (*Id.* Ex. 29 at 152).

Tuller regularly closed his initial-contact emails with the tagline, "You have all the Setai amenities available to you including room service, concierge, services, pool and beach services and gym/spa privileges. . . . I am also a Florida Realtor and I have been offering huge discounts at The Setai since the Resort and Spa first opened." (*Id.* Exs. 12–13, 15–21, 24, 26, 29–30 at 28, 31, 110, 115, 117, 119, 121, 123, 125, 131, 144, 152, 158–159.) Also, at time the Defendants arranged for housekeeping services for customers. (*Id.* Ex. 13 at 30; Sealed Depo. Allen Tuller at 32–34, ECF No. 149-1.) The Defendants, on one recorded

occasion, attempted to obtain tickets to a Miami Heat basketball game. (Aff. Daniel Barsky Ex. B at 1–2, ECF No. 146-2.)

Tuller does not dispute the statements in the emails, but notes that "the phrases [are taken] out of context to misrepresent the actual contents." (Decl. Allen Tuller # 2 ¶ 12, ECF No. 168; Defs.' SMF ¶ 34.) Tuller further notes that the previous owner of the Setai Hotel provided third-party housekeepers with key fobs to gain access to multiple units and that SHA only prohibited the provision of housekeeping services as of November 1, 2016. (*Id.* ¶ 13; (Decl. Allen Tuller # 1 ¶ 11, ECF No. 154; Defs.' SMF ¶ 34; Answer and Countercls. Ex. 12 at 1, ECF No. 138-12.) According to Tuller, the Defendants have acted in good faith and have modified certain conduct as soon as SHA has requested or required modification. (Decl. Allen Tuller # 1 ¶ 15, ECF No. 154; Decl. Allen Tuller # 2 ¶ 18.)

Tuller denies having any knowledge that the term "Setai" was a registered trademark. (Decl. Allen Tuller # 1 ¶ 10, ECF No. 154.) The Condominium Association always used the term Setai, in the same font with the same logo. (Decl. Allen Tuller # 1 ¶ 10, ECF No. 154.) The Condominium Association has been registered with the Florida Department of State Division of Corporations using the name Setai Resort & Residences Condominium Association, Inc., since 2003. (Answer and Countercls. Ex. 2 at 1, ECF No. 138-2.) The Association Board of Directors' meeting minutes are printed on paper bearing the double-palm logo and The Setai, with the web address www.setai.com. (Answer and Countercls. Ex. 3 at 1–2, 5–6, 8, ECF No. 138-3.) Tuller asserts that "'The Setai' was always used to refer to the condominium, including the Tower building where all the private residential suites are located." (Decl. Allen Tuller # 1 ¶¶ 10–11, ECF No. 154.)

## 2. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth*

*Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Id.* at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

The filing of cross-motions for summary judgment does not alter this legal standard. *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1317 (S.D. Fla. 2016), *appeal dismissed* (Aug. 4, 2016) (Moore, J.). "Rather, cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Id.* (internal quotations and citation omitted).

### 3. Legal Analysis

#### A. Motion for Judicial Notice

SHA asks the Court to take judicial notice of the following: (1) the file history of the '974 Mark maintained by the United States Patent and Trademark Office ("USPTO"); (2) the Declaration of Setai Resort & Residences, a Condominium, and the Special Warranty Deed; and (3) printouts of historical webpages for MBLR's website. (Mot., ECF No. 142.) The Defendants do not object to judicial notice of the Condominium Declaration and the Special Warranty Deed. (Resp. at 1, ECF No. 173.) However, the Defendants object to the other two requests. (*Id.* at 2–3.)

##### 1. *USPTO*

SHA asks the Court to take judicial notice of the file history of trademark registration Number 2,506,974 ("the Setai Mark"). (Mot. 2, ECF No. 142.) The file is publically available at the USPTO's website, http://tsdr.uspto.gov. (Reply at 2, ECF No. 180.) The file shows: (1) The Setai is a service mark assigned

registration number 2,506,974, first registered on November 13, 2011 (File at 1, ECF No. 142-1); the '974 Mark covers real estate management, real estate development and construction, and hotel and resort services (*Id.*); (2) the '974 Mark was renewed on June 5, 2007, and May 21, 2012 (*Id.* at 1–2); (3) the owners filed a combined declaration of use and incontestability, which the USPTO accepted and acknowledged on June 5, 2007 (*Id.* at 3, 37, 41); (4) the word "Setai" has no meaning in the English language (*Id.* at 62).

The Defendants oppose judicial notice of the USPTO file for the '974 Mark because they claim the file is incomplete and not authenticated by an affidavit. (Resp. at 2, ECF No. 173.) The Defendants also oppose judicial notice because the "Plaintiff is also trying to use the file to make certain claims in this lawsuit, even though those issues were not in dispute in the registrations filed with the USPTO." (*Id.*)

The Defendants raise no reasonable or understandable objection to the Court taking judicial notice of information publically available from an official government website. As such, the Court takes judicial notice of the USPTO file history for the '974 Mark. *See Turbyfill v. Scottsdale Indem. Co.*, No. 3:14CV283-RV/EMT, 2016 WL 741657, at *2 (N.D. Fla. Feb. 24, 2016) (taking judicial notice of information available to the public via the Department of Health official website); *In re Everglades Island Boat Tours, LLC*, 484 F. Supp. 2d 1259, 1261 (M.D. Fla. 2007) (taking judicial notice of government website); *Gent v. CUNA Mutual Ins. Society*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of relevant facts from the official website of the Center for Disease Control and Prevention); *Denius v. Dunlap*, 330 F.3d 919, 927 (7th Cir. 2003) ("The defendants have simply caused additional judicial work by contesting a factual issue that, according to information readily available in the public domain, cannot be reasonably disputed.").

### 2. *Condominium Declaration and Special Warranty Deed*

SHA asks the Court to take judicial notice of the Declaration of Setai Resort & Residences, a Condominium, recorded on January 16, 204, in the Official Records of Miami-Dade County. (Mot. at 3; *see also* Mot. Ex. B, ECF No. 142-2.) SHA also requests that the Court take judicial notice of the Special Warranty Deed recorded on March 3, 2015, in the Official Records of Miami-Dade County. (Mot. at 3; *see also* Mot. Ex. C, ECF No. 142-3.) The Defendants do not object (Resp. at 1), and the documents are ones that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court, therefore, takes judicial notice of the Condominium Declaration and the Special Warranty Deed.

### 3. *Internet Archives*

Finally, SHA asks this Court to take judicial notice of an historical version of MBLR's website found on the Internet Archive's Wayback Machine. (Mot. at 4.) The Defendants object. (Resp. at 2.)

First, SHA claims that pages 1 through 13 of Exhibit D are somehow related to the historical versions of the Defendants' website. But these pages show nothing more than what appears to be unintelligible computer coding. For example:

```
38        window._wpemojiSettings =
{"baseUrl":"/web/20160324130758/http://s.w.org\/images\/core\/emoji\/72x72\/","ext":".png
","source":
{"concatemoji":"/web/20160324130758/http://www.miamibeachluxuryrentals.com/wp-
includes\/js\/wp-emoji-release.min.js?ver=4.4"}};
39        !function(a,b,c){function d(a){var
c=b.createElement("canvas"),d=c.getContext&&c.getContext("2d");return d&&d.fillText?
(d.textBaseline="top",d.font="600 32px Arial","flag"===a?
(d.fillText(String.fromCharCode(55356,56806,55356,56826),0,0),c.toDataURL().length>3e3):
("simple"===a?
d.fillText(String.fromCharCode(55357,56835),0,0):d.fillText(String.fromCharCode(55356,571
35),0,0),0!==d.getImageData(16,16,1,1).data[0])):!1}function e(a){var
c=b.createElement("script");c.src=a,c.type="text/javascript",b.getElementsByTagName("head
")[0].appendChild(c)}var f,g;c.supports=
{simple:d("simple"),flag:d("flag"),unicode8:d("unicode8")},c.DOMReady=!1,c.readyCallback=
function(){c.DOMReady=!0},c.supports.simple&&c.supports.flag&&c.supports.unicode8||
(g=function(){c.readyCallback()},b.addEventListener?
```
EXHIBIT D

(Mot. Ex. D. at 2.) SHA provides no expert affidavit or any other explanation or interpretation of these pages. The Court cannot understand what information SHA seeks to convey. Without any substantiating information, these pages simply do not contain facts "not subject to reasonable dispute." The Court will not take judicial notices of pages 1 through 13 of Exhibit D.

Next, the remaining pages 14 through 40 of Exhibit D do appear to be printouts from the Wayback Machine's archive of the Defendants' website, www.miamibeachluxuryrentals.com. SHA argues that these documents are subject to judicial notice in the Southern District of Florida, relying on an order on a motion for temporary and preliminary injunctive relief in *Trobinick, MD v. Novella*, Case No. 14-cv-80781 (S.D. Fla. Apr. 2, 2014) (Rosenberg, J.). (*See* Order, Case No. 14-cv-80787, ECF No. 172 at 4.) *Trobinick* does not apply to the situation here. Judge Rosenberg took judicial notice of the *date* the webpage was created by consulting the Internet Archive's history of the page. (*Id.*) She did not judicially notice the documents for the truth of their contents. (*Id.*) Further, she relied on the Internet Archive only after two days of evidentiary hearings on the matters at issue. (*Id.*)

The other two federal district courts in Florida discussing a request for judicial notice of documents culled from the Wayback Machine declined to take judicial notice of those documents. *Nassar v. Nassar*, No. 3:14-CV-1501-J-34MCR, 2017 WL 26859, at *5 (M.D. Fla. Jan. 3, 2017); *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, No. 8:06CV223TMSS, 2006 WL 1320242, at *2

(M.D. Fla. May 12, 2006). In *Nassar*, the court noted that the historical contents of a website could only be judicially noticed if it were "information [that] 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" 2017 WL 26859, at *5 (quoting Fed. R. Evid. 201(b)(2)). There, the court determined that judicial notice was inappropriate because the information was from a private, non-governmental website, and because the Wayback Machine site itself includes a disclaimer that the Internet Archive "makes no warranty or representation regarding the accuracy . . . of the content . . . ." 2017 WL 26859, at *5 (internal citation and quotations omitted). In *St. Luke's*, the court noted that the person seeking judicial notice of information from the Internet Archive must provide an "affidavit from the Internet Archive representative with *personal knowledge* of the contents of the Internet Archive website." 2006 WL 1320242, at *2.

A review of caselaw across several district courts in several circuits reveals that this issue is far from settled. However, circuit courts generally have required that the Wayback Machine print-outs be authenticated by a representative with personal knowledge before they can be judicially noticed or admitted. *See, e.g.*, *United States v. Bansal*, 663 F.3d 634, 667–68 (3d Cir. 2011); *Novak v. Tucows, Inc.*, No. 06CV1909(JFB)(ARL), 2007 WL 922306, at *5 (E.D.N.Y. Mar. 26, 2007), *aff'd*, 330 F. App'x 204 (2d Cir. 2009); *Cf. Specht v. Google Inc.*, 747 F.3d 929, 933–34 (7th Cir. 2014).

Thus, the Court declines to take judicial notice of pages 14 through 40 of Exhibit D.

However, the Court notes that even though the Defendants objected to the Court taking judicial notice of the historical versions of the website, Tuller appears to provide lukewarm agreement that pages 14 through 40 are accurate representations of an older version of MBLR's website. Tuller, in his deposition, at first claims to recognize the previous versions of MBLR's webpage, but then qualifies that recognition with "this was not a complete page" and "It's not the way that . . . I remember . . . ." (Depo. Allen Tuller at 26–27, 32–33, 34, ECG No. 147-1.) Tuller claims not to have written or copied any of the information found on the website. (*Id.* at 33.) And yet, in the Defendants' statement of material facts in opposition to SHA's motion for summary judgment, the Defendants practically concede the accuracy of the content that SHA seeks to admit as evidence. As such, and as noted above, the Court will consider evidence from the historical version of MBLR's website to which the Defendants have conceded its accuracy.

Accordingly, the Court **grants in part** and **denies in part** SHA's motion for judicial notice (**ECF No. 142**).

## B. The Trademark Claims

SHA moves for summary judgment on the statutory trademark claims: counterfeiting pursuant to 15 U.S.C. § 1116 (Count 1); infringement pursuant to 15 U.S.C. § 1114 (Count 2); and unfair competition pursuant to the Lanham Act, 15 U.S.C. § 1125 (Count 3). (SHA Mot. Summ. J. at 6, ECF No. 164.) The Defendants move for summary judgment on all of SHA's trademark claims, including the additional common law claims: infringement (Count 4); unfair competition (Count 5); and dilution (Count 6). (Defs.' Mot. Summ. J. at 3–8, ECF No. 158.)

### 1. *Standing*

As an initial matter, the Court finds that SHA has standing to bring this action. The Defendants argue that SHA does not have standing to bring this action because SHA did not obtain any rights to the Setai Mark until after April 1, 2015, the date BPI and the Trust signed the Lehman Assignment. (Defs.' Resp. at 5–6, ECF No. 169; Defs.' Mot. Summ. J. at 3–4, ECF No. 158.) The Defendants also assert that only BPI and the Trust have the right to bring claims arising in relation to the '974 Mark, unless certain "conditions precedent" are met. (Defs.' Resp. at 5–6; Defs.' Mot. Summ. J. at 3–4.)

SHA notes that the Lehman Assignment is dated February 27, 2015, as is the Special Warranty Deed transferring the real property to SHA. (Pl.'s Resp. at 2–3, ECF No. 166; Special Warranty Deed, Am. Compl. Ex. 2 at 2, ECF No. 110-2.) SHA further asserts that the SHA License makes SHA the exclusive licensee and expressly permits SHA to take action with respect to any purported infringement of the '974 Mark. (Pl.'s Resp. at 3.) Finally, SHA presented the Declaration of Robert Spiegleman, general counsel to Nakash Holdings LLC, a manager of SHA, and director of BPI, noting that BPI "specifically authorized and directed SHA to undertake this lawsuit in its own name." (Pl.'s Reply Ex. B at 4, ECF No. 181-2.)

The Defendants arguments do not overcome SHA's standing to bring this lawsuit. First, SHA is the exclusive licensee of the '974 Mark and, as such, has standing to bring a suit in its name. *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1280 (S.D. Fla. 2013) (Marra, J.) ("[E]xclusive licensees of Trademarks can sue to protect the Trademark from infringement."); *Cf. Hako-Med USA, Inc. v. Axiom Worldwide, Inc.*, No. 806CV-1790T-27EAJ, 2006 WL 3755328, at *3 (M.D. Fla. Nov. 15, 2006), *report and recommendation adopted*, No. 8:06CV1790 T27EAJ, 2006 WL 3760415 (M.D. Fla. Dec. 19, 2006) ("[B]ecause an exclusive license is equivalent to an assignment, standing is conferred on an exclusive licensee to bring suit in its own name if the exclusive

licensee holds 'all substantial rights' to the patent." (citing *Prima Tek II, LLC v. A–Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000))).

Next, BPI and the Trust became the legal owners of the '974 Mark on February 27, 2015. Regardless of the date of the signature on the Lehman Assignment, the express language therein makes the assignment executed "as of the date first written above"—which is clearly February 27, 2015. The Defendants have cited no law that precludes post- or pre-dating an assignment of a trademark. (Defs.' Resp. at 5; Defs.' Mot. Summ. J. at 4.) And although SHA equally has not provided the Court with any law to support the validity of a nunc pro tunc assignment of a trademark (Pl.'s Resp. at 2–3), the Court finds that the post-dated signatures here do not alter the effective date expressly provided for in the Lehman Assignment. *Cf. Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.,* 70 F.3d 96, 99 (11th Cir. 1995) (recognizing under copyright law the validity of "an oral assignment later ratified or confirmed by a written memorandum of the transfer"); *Oceans of Images Photography, Inc. v. Foster & Smith, Inc.,* No. 8:11-CV-1160-T-30AEP, 2012 WL 5878092, at *4 (M.D. Fla. Nov. 21, 2012) (recognizing the validity of a copyright assignment signed on September 6, 2011, with an effective date of May 5, 2011).

Finally, SHA has the right to bring this lawsuit. The SHA License simultaneously permits SHA to initiate legal action against any infringement of the '974 Mark and obligates SHA to prohibit others from using the '974 Mark in any way that does not inure to the benefit of BPI and the Trust. (*Compare* SHA License § 4.2 *and* SHA License § 4.1(a).) Reading these two provisions together, as this Court must, supports only an interpretation that authorizes SHA to raise these infringement claims against the Defendants. *See Sanofi–Aventis Deutschland GmbH v. Genentech, Inc.,* 716 F.3d 586, 591–93 (Fed. Cir. 2013) (discussing breach of a license agreement analyzed under the law governing the agreement); *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.,* 127 A.D.3d 48, 54 (N.Y. App. Div. 2015) (noting that under New York law,[6] a court should interpret a contract in a way that "gives meaning to every provision of the contract") (internal citations and quotations omitted). Moreover, BPI (with 85% ownership of the '974 Mark) and SHA (with the exclusive license to use the '974 Mark) share a common owner. The Court must consider this organizational relationship in interpreting the provisions of the SHA License. *Id.* (noting a court "should read the entirety of the agreement in the context of the parties' relationship").

---

[6] New York law governs the SHA License. (SHA License § 8.2 at 7.)

## 2. *Infringement*

"Under the Lanham Act, 15 U.S.C. § 1114(1), a defendant is liable for trademark infringement if, without consent, he uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark that is likely to cause confusion, or to cause mistake, or to deceive." *Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016) (internal citations and quotations omitted). Thus, in order to prevail on a federal trademark infringement claim under the Lanham Act, SHA must demonstrate (1) that its mark had priority, and (2) that the Defendants' uses of the mark were likely to cause consumer confusion. *Id.*

Somewhat surprisingly, the Defendants appear not to contest the priority of SHA's mark. Nonetheless, the Court notes that SHA's mark is incontestable and does have priority. The certificate of registration constitutes "prima facie evidence of the validity of the registered mark . . . and of the owner's exclusive right to use the registered mark . . . in connection with the . . . services specified in the certificate . . . ." 15 U.S.C. § 1057(b). Subject to a few caveats and exceptions not relevant here, a mark "in continuous use for five consecutive years subsequent to the date of [the] registration and . . . still in use in commerce, shall be incontestable." 15 U.S.C. § 1065.

In evaluating the second prong, whether the Defendants' uses of the mark create a likelihood of confusion, the Court must consider seven factors: (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997); *see also Florida Int'l Univ.*, 830 F.3d at 1255. "Of these factors, the type of mark and the evidence of actual confusion are the most important." *Id.*

(a) *Type of Mark*

The type of mark that a plaintiff has determines whether it carries strong or weak protection. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). There are four categories of mark, ranging from weakest to strongest:

(1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no

relationship to the product or service, and the strongest category of trademarks.

*Tana v. Dantanna's*, 611 F.3d 767, 774 (11th Cir. 2010) (citation omitted).

Here, the word "Setai" has no meaning in the English language and does not suggest any particular kind of services or product. Further, the mark is incontestable, which strengthens the mark. The Setai Mark is clearly fanciful, and should be accorded the strongest protection.

(b) *Similarity of mark*

Under this factor, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enters.*, 192 F.3d at 1337. SHA asserts that the Defendants are using an identical mark. (Pl.'s Mot. Summ. J. at 15.) And yet, this is not the average case where the alleged infringer has appropriated or incorporated the registered mark as its own. *See, e.g., Lone Star Steakhouse*, 122 F.3d at 1382 (analyzing the use of the "Lone Star Steaks" mark and the "Lone Star Café" mark); *Florida Int'l Univ.*, 830 F.3d at 1260 (analyzing the use of the "Florida International University" mark and the "Florida National University" mark).

Here, the Defendants' business does not appropriate or incorporate the term "Setai"—but the Defendants frequently used the term "Setai" in their marketing of MBLR and in correspondence with potential customers in a way that made it appear as if the Defendants and "the Setai" were one and the same. For instance, the Defendants advertised special holiday events at the Setai Hotel by stating, "we will present a series of special activities and events . . . ." (Pl.'s SMF ¶ 30; Defs.' SMF ¶ 30.) The Defendants claimed to offer rooms for rent that included "the Setai Hotel Finishings and Furnishings package." (Sealed Depo. Allen Tuller Ex. 8 at 16.) Tuller's standard tagline on his initial correspondence with customers created an appearance of a close alliance between MBLR and the Setai Hotel: "You have all the Setai amenities available to you including room service, concierge, services, pool and beach services and gym/spa privileges. . . . " (*Id.* Exs. 12–13, 15–21, 24, 26, 29–30 at 28, 31, 110, 115, 117, 119, 121, 123, 125, 131, 144, 152, 158–159.) The Defendants used "Setai" as a search term to direct internet traffic to MBLR's website. Finally, the Defendants owned the domain name www.setai.net and redirected traffic from that domain name to MBLR's website. All of this conduct blurred the line between the Defendants and the Setai Mark. In this sense, the manner in which the mark was used created similarity between the Setai Mark and the Defendants.

(c) *Similarity of the products the marks represent*

"The third factor asks whether the parties' services are the kind that the public attributes to a single source." *Florida Int'l Univ.*, 830 F.3d at 1261 (internal quotations and citation omitted). "The test is not whether the products can be readily distinguished, but rather whether the goods are 'so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods.'" *Id.* (internal quotations and citation omitted). "The focus is on the reasonable belief of the average consumer as to what the likely source of the goods is." *Id.* (internal quotations, citation, and alterations omitted).

Here, SHA contends that both parties offer to the public "marketing and management of units for transient rental." (Pl.'s Mot. Summ. J. at 16.) The Defendants contend that "MBLR is a real estate company, which rents private residential condominium units[,] [and SHA] is a hotel who [sic] is now trying to expend [sic] its mark to include condominiums and condominium services." (Defs.' Mot. Summ. J. at 11.) But the bottom line remains that both SHA and the Defendants offer accommodations for short-term visitors to Miami Beach.

The Court imagines, but cannot find support in the record, that the average traveler would not conceptualize that a "hotel" would be comprised of individually owned condominium units. Certainly, Furrer stated that SHA officially does not inform guests that their hotel room has an individual owner separate from The Setai Hotel. And the Court has already found that the Defendants blurred the line between the Setai Hotel and the units offered by the Defendants. Thus, the average traveler might assume that when MBLR offers a suite in the "Hotel tower" or the "Hotel in the tower," it is doing so on behalf of or for the benefit of the Setai Hotel and the traveler will be staying in the "actual" hotel.[7]

(d) *Similarity of the parties' retail outlets and customers*

"'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception.'" *Frehling Enters.*, 192 F.3d at 1339 (quoting *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 262 (5th Cir. 1980)). "This factor takes into consideration where, how, and to whom the parties' products are sold. . . . The parties' outlets and customer bases need not be identical, but some degree of overlap should be present." *Frehling Enters.*, 192 F.3d at 1339.

---

[7] In other words, the Court likens the "marketing" provided by MBLR to a third-party search engine for airline tickets—ultimately, the purchaser obtains a ticket for a seat on the actual commercial airline, even though purchased through the third-party website.

The record contains no clear evidence on this factor. SHA argues that "SHA and [the] Defendants book customers through internet portals . . . and that these customers are persons seeking short term or transient accommodations on Miami Beach." (Pl.'s Mot. Summ. J. at 16.) But an ordinary stroll down Lincoln Road reveals a highly dissimilar customer base, and the Court might assume the same of the pool of individuals seeking transient accommodations via internet searches. In addition, given the price disparity between rooms offered by the Setai Hotel and rooms offered by the Defendants, the Court could conclude that the parties have separate and distinct customer base. Regardless, such a conclusion remains unsupported by the record on summary judgment, and likewise the record does not support a conclusion that the parties' customer base overlaps.

(e) *Similarity of advertising media used*

"This factor looks to each party's method of advertising." *Frehling Enters.*, 192 F.3d at 1339. SHA contends that the parties use the same advertising methods because they both advertise on the internet. (Pl.'s Mot. Summ. J. at 17.) Certainly, sufficient and unrefuted evidence exists that the Defendants advertise on the internet. However, neither party presented evidence regarding how SHA advertises the Setai Hotel, other than its official website and booking portal, www.thesetaihotel.com. (Pl.'s SMF ¶ 32.) Even if the Court assumed that SHA advertised exclusively on the internet, that finding does not resolve this factor. "[T]he standard is whether there is likely to be significant enough overlap in the readership of the [websites] in which the parties advertise that a possibility of confusion could result." *Frehling Enters.*, 192 F.3d at 1340. The record does not disclose whether SHA advertises on Facebook, Pinterest, Google+, and Homeaway, and does not disclose whether the same users of those services also access advertising through some other avenue possibly utilized by SHA. Again, the Court does not have sufficient information to determine in whose favor this factor inures.

(f) *Defendant's intent*

Under this factor, the Court "determin[es] whether the defendant had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent . . . ." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007) (internal quotations omitted). SHA provided evidence of the Defendants' repeated use of direct references to the Setai Mark and the Setai Hotel, some of which likely went beyond mere location or comparison of prices. The Court finds especially noteworthy the Defendants' late stipulation to using the domain name www.setai.net to redirect internet traffic to MBLR's website.

All the same, the record raises issues of fact as to the Defendants' intent. First, Tuller expressly asserts good faith intentions and provides slight support for that assertion—for example, legal counsel for the previous owner of the Setai Hotel does appear to have approved MBLR's website and its repeated references to the Setai Mark. The Defendants contend that once they learned of this lawsuit, those references to the Setai Mark were removed. Next, the Declaration expressly allows the third-party transient rental of individually owned condominium units and expressly requires unit owners to rely on third-party agencies for "service issues" and "distribution and exchange of Unit keys." (Am. Decl. ¶¶ 16.7, 17.1(c) & (d), Mot. Ex 1 at 171, ECF No. 19-1.) The Declaration makes the Condominium's common areas part of the Hotel Unit, and thus part of SHA's real property and under SHA's control, but also allows access to those areas for unit owners and their transient renters. Tuller reasonably could have believed he was acting appropriately under the Declaration. Further, the Condominium's and the Association's use of the term Setai, the same distinctive font, and the double-palm logo could have reasonably made Tuller believe he was authorized to use the Setai Mark.

In short, making a determination on this factor would require the Court "to consider one party's evidence more credible than the other." *Provide Commerce, Inc. v. Preferred Commerce, Inc.*, No. 07-80185, 2008 WL 926777, at *3 (S.D. Fla. Apr. 4, 2008) (Ryskamp, J.). Of course, "[c]redibility determinations . . . are within the sole province of the jury." *Id.* Moreover, generally the determination of "a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) (citing *Morissette v. United States,* 342 U.S. 246, 274 (1952)). Finally, even if the facts in the record could "support an inference of knowledge or willful blindness . . . they do not so clearly compel that conclusion as to warrant finding intent as a matter of law." *Italian Activewear*, 931 F.2d at 1476.

(g) *Actual confusion*

"It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling Enters.*, 192 F.3d at 1340. "However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case." *Id.* Courts have not found actual confusion in cases where evidence shows only a small number of individuals experienced confusion over a moderate number of years. *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982) (collecting cases). Further, "as important as . . . the number of instances of confusion are the kinds of persons confused and degree of confusion." *Id.*

"Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight . . . while confusion of actual customers of a business is worthy of substantial weight." *Id.* In *Safeway*, the court found it "worthy of some consideration" that the three instances of confusion involved two suppliers who were familiar with the business and one customer. *Id.*

Here, SHA provided evidence of one confused customer in more than ten years that the Defendants have been renting rooms at the Condominium. (Aff. Daniel Barsky Exs. D, E, F, ECF Nos. 144-5, 144-6, 144-7.)[8] The specific customer stated his family had visited "the Setai" six times but the service had diminished in quality and his "signing privileges" had been revoked. (*Id.* Ex. E at 1.) But the record is unclear whether this confusion resulted from the Defendants' use of the Setai Mark, or whether it resulted from SHA's policy change that refused certain services and privileges to guests who had booked a room through a third-party agency.[9]

Even though the confusion came from an actual customer, and so carries significant weight in the balancing of factors, the source of the confusion remains debatable. This, combined with the fact that SHA has presented evidence of only one incident of confusion, shows only the slightest indication that actual confusion exists.

### (h) *Balancing of Factors*

The Court finds that the first three factors—type of mark, similarity of mark, and similarity of the products the marks represent—weigh strongly in favor of finding a likelihood of confusion, and the seventh factor—actual prejudice—weighs only slights in SHA's favor. However, because neither SHA nor the Defendants have provided the Court with evidence to evaluate the fourth and fifth factors—similarity of the parties' retail outlets and customers and similarity of advertising media used—the Court cannot make a determination as to those factors. Finally, an issue of fact exists with respect to the sixth factor—the defendant's intent. As a result, the Court cannot find at this point and on the record before it that the Defendants infringed on the Setai

---

[8] The Court notes that SHA provided three exhibits regarding actual confusion. However, each exhibit concerns the same customer.

[9] The Court notes that the disgruntled customer arrived on July 27, 2016, and departed on August 5, 2016. (Aff. Daniel Barsky Ex. F, ECF No. 144-7.) The Court further notes that SHA issued a new registration form for transient tenants on March 18, 2016, that stated "signing privileges are **not** available for payment at hotel outlets such as the restaurants, pools, bars and spa." (Answer and Countercls. Exs. 10 & 11, ECF Nos. 138-10, 138-11.) Later, after this customer complained, SHA issued yet another new registration form that did not include the same provision regarding signing privileges. (*Id.* Ex. 13, ECF No. 138-13.)

Mark, and neither party is entitled to summary judgment for SHA's trademark infringement claims (Counts 2 and 4).

### 3. *Counterfeiting*

To prove a claim for counterfeiting, SHA must prove that the Defendants "infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a), and [that the Defendants] 'intentionally used a mark, knowing such mark is a counterfeit mark.'" *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994) (quoting 15 U.S.C. § 1117(b)). A "counterfeit" mark means "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The Court has not been able to determine whether the Defendants violated § 1114(1)(a). Moreover, even if the record supports a finding that the Defendants intentionally used the Setai Mark, a question of fact exists regarding whether the Setai Mark as the Defendants used it was a "counterfeit mark" and, if so, whether the Defendants knew they were using a "counterfeit mark."

Neither party is entitled to summary judgment on SHA's counterfeiting claim (Count 1).

### 4. *Unfair Competition*

SHA's sole argument for summary judgment on the unfair competition claim is that "because SHA has shown it should prevail on it trademark infringement claims, it necessarily follows that SHA prevails on its common law unfair competition claim." (Pl.'s Mot. Summ. J. at 22.) The Defendants agree that the legal standard for determining an unfair competition claim is essentially the same as for a trademark infringement claim. (Defs.' Mot. Summ. J. at 6.)

"[T]he Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks, even in the absence of federal trademark registration." *Custom Mfg.*, 508 F.3d at 647 (internal citation, quotations, and ellipses omitted); *see also* 15 U.S.C. § 1125. "Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 n. 4 (11th Cir. 2001).

Again, because questions of fact remain as to SHA's trademark infringement claims, neither party is entitled to summary judgment on the unfair competition claims (Counts 3 and 5).

### 5. *Dilution*

SHA did not move for summary judgment on its claim for trademark dilution. (Pl.'s Mot. Summ. J. at 1, 17.) The Defendants purport to move for

summary judgment on all of SHA's trademark claims. (Defs.' Mot. Summ. J. at 3.) However, neither party raised any factual assertions or legal argument regarding trademark dilution. As such, neither party is entitled to summary judgment on SHA's trademark dilution claim (Count 6).

### 6. *Trademark Affirmative Defenses*

The Defendants raised twenty-seven affirmative defenses to SHA's trademark claims. In response to SHA's motion for summary judgment on the statutory trademark claims, the Defendants raise their First, Seventh, Eighth, and Twentieth affirmative defenses—fair use. (Resp. at 16, ECF No. 169.) Further, in their motion for summary judgment, the Defendants raised arguments on their Fifth, Sixth, Eleventh, Fourteenth, Sixteenth, and Nineteenth affirmative defenses. (Defs.' Mot. Summ. J. at 5–8.) Although not separately raised, the Defendants do mention in the summary judgment pleadings their Eighteenth affirmative defense—that the Condominium Declaration permits their use of the Setai Mark. The Defendants have failed to put forth any evidence or arguments regarding their Second, Third, Fourth, Ninth, Tenth, Twelfth, Thirteenth, Fifteenth, Seventeenth, Tweny-first, Twenty-second, Twenty-third, Twenty-fourth, Twenty-fifth, and Twenty-sixth, and Twenty-seventh affirmative defenses, and the Court will not consider them.

Because the record did not support a determination of infringement, the Court need not consider any of the Defendants' affirmative defenses. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) ("If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."). However, in the interest of judicial economy and to narrow the issues at trial, the Court will analyze the affirmative defenses raised by the Defendants in their summary judgment pleadings.

### (a) *Fair Use*

"A fair-use defense is established if a defendant proves that its use is (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (internal citations and quotations omitted). "The 'fair-use' defense, in essence, forbids a trademark registrant [from] appropriat[ing] a descriptive term for its exclusive use and so prevent[ing] others from accurately describing a characteristic of their goods [or services]." *Id.* (internal citation and quotations omitted). For example, a defendant can assert fair use where the mark is used to describe a geographic location or to compare services. 15 U.S.C. § 1115(b)(4) (mentioning description of geographic origin as a fair use); *Setai Hotel Acquisitions, LLC v. Luxury Rentals Miami Beach, Inc.*, No. 16-21289-CIV, 2016

WL 7217730, at *2 (S.D. Fla. Dec. 9, 2016) (Moreno, J.) ("One can use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product." (quoting *Bd. of Supervisors of the Louisiana State Univ. v. Smack Apparel Co.*, 438 F. Supp. 2d 653, 662 (E.D. La. 2006))).

Certainly, the record shows instances where the Defendants used the Setai Mark merely to indicate the location of the unit or to compare the prices available through the Defendants or directly through the Setai Hotel. But more importantly, the record more than adequately shows that the Defendants went beyond fair use of the Setai Mark. If SHA ultimately proves infringement, the Defendants cannot rely on the affirmative defense of fair use. The Court denies entry of summary judgment for the Defendants on the First, Seventh, Eighth, and Twentieth affirmative defenses.

(b) *Misrepresentation of Goods*

The Defendants argue that SHA has misrepresented the source of goods or services provided to the public by allowing the Condominium Association to use the Setai Mark, its distinctive font, and the double-palm logo. (Defs.' Mot. Summ. J. at 5.) While the record contains evidence that the Condominium Association did, in fact, use the Setai Mark, its distinctive font, and the double-palm logo, the record does not contain any evidence that the Condominium Association provides hotel and resort services. As such, the Court cannot grant summary judgment in favor of the Defendants on their Fifth and Nineteenth affirmative defenses.

(c) *Improper Expansion of Mark*

The Defendants assert that SHA is improperly trying to expand its mark to cover condominiums. If the Court understands the Defendants' argument, they claim that SHA wishes to preclude any unit owners from using the Setai Mark by asserting ownership over the building in which the individually owned units are located. (Defs.' Mot. Summ. J. at 5–6.) However, the Special Warranty Deed accords SHA ownership rights over various components of the Condominium. Asserting that proper ownership cannot transform into an improper expansion of a trademark. In other words, SHA's real property ownership rights are established separate and apart from any license to use the Setai Mark. Moreover, those ownership rights do not expand or contract SHA's status as exclusive licensee of the Setai Mark. The Court cannot grant summary judgment in favor of the Defendants on their Fifth, Sixth, and Fourteenth affirmative defenses.

(d) *Laches*

"Laches is an equitable defense and arises from the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Ford Motor Co. v. O.E. Wheel Distributors, LLC*, 868 F. Supp. 2d 1350, 1366 (M.D. Fla. 2012) (internal citation and quotations omitted). "In order to put forth such a defense, a defendant must show that there was: (1) an unreasonable delay in the plaintiff's assertion of a right or claim; (2) the delay was not excusable; and (3) the delay caused undue prejudice." *Id.*

Without more, the Defendants have not carried their burden on summary judgment to bring forth evidence proving these three elements. The Defendants cite only to Tuller's declaration. *Cf. Pdq Coolidge Formad, LLC v. Landmark Am. Ins. Co.*, No. 12-CV-20627-KMM, 2013 WL 12077448, at *3 (S.D. Fla. Apr. 26, 2013) (Moore, J.), *aff'd,* 566 F. App'x 845 (11th Cir. 2014) ("[O]ne cannot oppose summary judgment with a self-serving, conclusory affidavit that fails to set forth specific facts to show why there is an issue for trial, and fails to demonstrate that the facts presented in the affidavit are based on personal knowledge beyond mere speculation or belief.") (internal citation omitted). Even if the Defendants had shown an inexcusable and unreasonable delay, they do not mention or point to any evidence of undue prejudice. *O.E. Wheel Distributors*, 868 F. Supp. 2d at 1366.

The Court cannot grant summary judgment in favor of the Defendants on their Eleventh affirmative defense.

(e) *Acquiescence*

"Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of the mark." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996). "The defense requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.*

Here, the evidence shows that SHA's predecessor actively represented in cease-and-desist letters that it *would* assert a claim for infringement if the Defendants did not comply with the advertising and solicitation guidelines. (Aff. Daniel Barsky Exs. 1–3, ECF No. 165.) Certainly, a possibility exists—as discussed above—that the Defendants reasonably could have believed that they had resolved the issues that gave rise to the cease and desist letter. But the Defendants' belief remains inapposite to the elements required to prove the

defense of acquiescence. Furthermore, even if the Defendants had proven the first two elements, the Defendants have not shown undue prejudice. The Court cannot grant summary judgment in favor of the Defendants on their Sixteenth affirmative defense.

### C. Tortious Interference

The Defendants move for summary judgment on SHA's claim for tortious interference. To prevail on a claim for tortious interference under Florida law, the plaintiff must prove: (1) the existence of a business relationship; (2) the defendant's knowledge of that business relationship; (3) the defendant's intentional and unjustifiable interference with that business relationship; and (4) damages to the plaintiff as a result. *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) (McAliley, J.). "To be liable for tortious interference a defendant must have both the intent to damage the business relationship and a lack of justification for doing so." *Id.* (internal citation and quotations omitted).

Here, SHA has shown that as a "Unit Owner" under the Declaration it is a party to the Declaration and has rights and obligations under that contract. Also, the record shows that the Defendants clearly are aware of that relationship. However the third and fourth elements remain far less clear on the record.

First, as discussed above, the Defendants' intent is a question of fact best left for determination by the jury. *Italian Activewear*, 931 F.2d at 1476. Next, the parameter of the "business relationship"—in this case, the scope of "hotel-related services" under the Declaration—remains an unresolved issue of fact. SHA concedes as much in its response. (Resp. at 9, ECF No. 166.) Finally, the record contains little reference to actual damages to SHA. In fact, in its motion for summary judgment, SHA asks the Court to reserve ruling on the issue of non-statutory damages, presumably to be determined at trial. (Pl.'s Mot. Summ. J. at 23.)

Thus, issues of fact preclude entry of summary judgment on SHA's tortious interference claim (Count 7).

Presumably, the Defendants also move for summary judgment on the four affirmative defenses they raise to SHA's tortious interference claim. However, the Defendants have failed to put forth any evidence or arguments regarding the Twenty-eighth, Twenty-ninth, and Thirty-first affirmative defenses, and thus the Court will not consider those. As to the Thirtieth affirmative defense, the Defendants argue that SHA cannot unilaterally determine the definition of "hotel services" under the Declaration. This argument concerns the scope of "hotel-related services" under the Declaration,

which the Court already has determine remains an unresolved issue of fact. Thus, the Court cannot grant summary judgment on the Defendants' Thirtieth affirmative defense.

### D. The Defendants' Counterclaims

The Defendants raise as counterclaims false advertisement under the Lanham Act, unfair competition, and a violation of Florida's Deceptive and Unfair Trade Practices Act. (Answer and Countercls. at 35–41.) Neither party has moved for summary judgment on theses counterclaims. However, "the legal analysis is the same for . . . violations of the Lanham Act, FDUPTA, and Florida state common law for infringement and unfair competition." *Suntree Techs.*, 693 F.3d at 1345. Thus, resolution at trial of SHA's statutory trademark claims will also resolve the Defendants' counterclaims. Even so, should the Defendants ultimately succeed in their counterclaims, nothing in this order will preclude SHA from asserting its affirmative defenses to the Defendants' counterclaims.

## 4. Conclusion

Accordingly, for the reasons set forth above, the Court **grants in part and denies in part** SHA's motion for judicial notice (**ECF No. 142**), **denies** the Plaintiff's Motions for Summary Judgment (**ECF No. 164**), and **denies** the Defendants' Motion for Summary Judgment (**ECF No. 158**).

**Done and ordered**, at Miami, Florida, on August 15, 2017.

Robert N. Scola, Jr.
United States District Judge